Slip Op. 15 - 59

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MAVERICK TUBE CORPORATION, | : |
| Plaintiff, | : |
| and | : |
| UNITED STATES STEEL CORPORATION, BOOMERANG TUBE LLC, ENERGEX TUBE (a division of JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., and WELDED TUBE USA INC., | : |
| Plaintiff-Intervenors, | : Before: R. Kenton Musgrave, Senior Judge |
| v. | : Consol. Court No. 14-00229 |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| TOSCELIK PROFIL VE SAC ENDUSTRISI A.S., CAYIROVA BORU SANAYI VE TICARET A.S., BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., and BORUSAN ISTIKBAL TICARET, | : |
| Defendant-Intervenors. | : |

**OPINION AND ORDER**

[On USCIT Rule 56.2 motions, countervailing duty investigation of hot-rolled steel from Turkey remanded to International Trade Administration, U.S. Department of Commerce.]

Dated: June 15, 2015

*Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein, LLP, of Washington DC, for the plaintiff Maverick Tube Corporation.

*Robert E. Lighthizer*, *Jeffrey D. Gerrish*, and *Nathaniel B. Bolin*, Skadden Arps Slate Meagher & Flom, LLP, of Washington DC, for the plaintiff-intervenor United States Steel Corporation.[1]

*Hardeep K. Josan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of Counsel on the brief was *Scott D. McBride*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*David L. Simon*, Law Office of David L. Simon, of Washington DC, for the defendant-intervenors Toscelik Profil ve Sac Endustrisi A.S. and Cayirova Boru Sanayi ve Ticaret A.S.

*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*, Morris Manning & Martin, LLP , of Washington DC, for the defendant-intervenors Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret.

Musgrave, Senior Judge: This consolidated matter encompasses three of the four lawsuits initiated by domestic industry petitioners and Turkish respondents all separately challenging aspects of *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41964 (July 18, 2014), PDoc 369, and accompanying issues and decision memorandum (July 10, 2014) ("*IDM*"), PDoc 363, (collectively "*Final Determination*"), a final affirmative countervailing duty ("CVD") investigation conducted by the International Trade Administration, U.S. Department of Commerce ("Commerce") covering the investigatory period January 1, 2012, through December 31, 2012 ("POI"). The focus of the proceeding at bar, in which Maverick Tube Corporation ("Maverick") and United States Steel Corporation ("U.S. Steel"), U.S. domestic industry petitioners,

---

[1] The other captioned plaintiff-intervenors did not participate in litigation.

are nominally captioned as plaintiff and plaintiff-intervenor respectively, is the alleged Turkish state provision of hot-rolled steel ("HRS") for less than adequate remuneration ("LTAR") in the production of oil country tubular goods ("OCTG"). *See* 19 U.S.C. §1677(5).

The fourth suit, unconsolidated, was filed against the United States by Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret (together "Borusan"). Intervening in this action after it was consolidated, Borusan sides with the other Turkish respondents Toscelik Profil ve Sac Endustrisi A.S. and Cayirova Boru Sanayi ve Ticaret A.S. (together, "Toscelik"), all nominally captioned as defendant-intervenors, in support of Toscelik's motion for judgment. Borusan's own case is already before Commerce on remand,[2] with results of redetermination due July 17, 2015. Familiarity with that case is here presumed, as it sets forth the procedural and certain substantive background pertinent to this matter. Jurisdiction is also here invoked pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. §1516a(a)(2)(B)(i), and 28 U.S.C. §1581(c). And substantive briefing on the parties' separate motions for judgment pursuant to USCIT Rule 56.2 has proceeded according to schedule.[3]

---

[2] *See generally* Court No. 14-00214; *see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, Slip Op. 15-36 (Apr. 22, 2015) ("*Borusan*"). Borusan pressed ahead in that proceeding with a "motion to expedite briefing and consideration." Court No. 14-00214, ECF No. 7. Filing of a joint proposed scheduling order, to which the defendant had consented, mooted acting on the motion to expedite briefing. *Id.*, ECF No. 11. Motions to intervene in that action were filed thereafter. The motions were duly acted upon in the order received, *see id.*, ECF Nos. 30-33, except that issuance of slip opinion 15-36 in due course obviated acting upon the motion for expedited consideration (and its proposed order's peculiarity, *i.e.*, having the court order itself to consider the case on an expedited basis). Emphasized here is that the *Borusan* court has only acted pursuant to a consented-to motion for scheduling and not affirmatively acted upon a motion to expedite.

[3] For which the parties are all to be commended. After response briefs to those motions were filed, the defendant renewed a motion to consolidate *Borusan* with this matter, arguing that further
(continued...)

I. *Maverick's and U.S. Steel's Motions for Judgment*

Maverick's Rule 56.2 motion challenges the exclusion of certain "tier-two" benchmark data provided by it for the record, and also the exclusion of import duties from certain prices used for that benchmark. U.S. Steel's briefing on its Rule 56.2 motion adopts Maverick's arguments as briefed.

A. Exclusion of Certain Benchmark Data

Commerce's regulations set forth a hierarchy, or "tiers", governing how it will determine whether adequate remuneration was paid for a good or service in question. *See* 19 C.F.R. §351.511. Tier one compares the "government price" paid by a respondent "to a market-determined price for the good or service resulting from actual transactions in the country in question." *Id*., §351.511(a)(2)(I). If Commerce concludes that there is no useable market-determined price with which to make such comparisons, it resorts to tier two, a comparison of "the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id*., §351.511(a)(2)(ii). The *status quo* of this matter is rejection of tier-one pricing and reliance upon a tier-two benchmark. *See IDM* at 38-39.

During the investigation, Maverick placed world market HRS benchmark prices on the record, including monthly export prices of HRS from countries around the globe derived from the Global Trade Atlas ("GTA"), transaction price indices from MEPS (International) Ltd., prices

---

[3] (...continued)
consolidation would conserve resources and avoid duplication. In *Borusan*, the defendant has likewise procedurally moved, for the same reasons, and it also moved to stay further proceedings on that case. The motion to stay was denied, Court No. 14-00214, ECF No. 81, but the motions to consolidate have been held in abeyance.

from a source named "CRU," and a price series from Steel Business Briefing (SSB). *See IDM* at 25; *see also* PDoc 166 at 9-12. Maverick contests Commerce's rejection of these data and argues Commerce should have used instead a simple average of all available data except for imports to and exports from Turkey. Maverick Br. at 7. *See IDM* at 46-48.

Complaining that Commerce did not average all of the prices made available to it, Maverick argues three general points: (1) Commerce has stated in several previous cases that its goal is to "derive the most robust HRS benchmark possible" and thus it has used the largest number of data points as possible; (2) the data sources supplied by Maverick have been used by Commerce in other administrative proceedings and there was "no evidence of, for example, export barriers, import barriers, or other government distortions in the countries in question that might support a conclusion that export prices would differ from any domestic prices represented by the data"; and (3) the relevant regulation states that "where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable." *See* 19 C.F.R. §351.511(a)(2)(ii).

Commerce will calculate a simple average "when the datasets on the record [are] not reported in a uniform manner." *See, e.g., Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75978 (Dec. 26, 2012) (final affirmative CVD deter.) and accompanying issues and decision memorandum at cmt. 15. Commerce determined that the GTA data did not present such a circumstance, *see IDM* at 48, and Maverick does not contest the determination that the GTA data are reported on a uniform basis. Maverick's contention for simple averaging, thus, depends upon the validity of the administrative disregard of its proffered MEPS, CRU and SBB data.

Commerce agreed with Maverick that it has interpreted 19 C.F.R §351.511(a)(2)(ii) "within the context of our goal to derive the most robust benchmarks possible; thus we have sought to include as many data points as possible." *IDM* at 42. However, Commerce also recognized that the regulation states that a tier-two world market benchmark price can only be used if it is "reasonable to conclude that such price[s] would be available to purchasers in the country in question". *Cf. id. with* 19 C.F.R §351.511(a)(2)(ii). Similar to Commerce's rejection of the SBB data that were considered in *Borusan*, Commerce explained in the *Final Determination* that it would not use these "prices because record information indicated that these were domestic prices (not export prices) in specific countries", noting further that petitioners "did not contend that the MEPS, CRU or SBB prices represent export prices." *IDM* at 47. Commerce explained that "[r]egardless of the Department's inclusion of these price series in past investigations, the information about the MEPS, CRU and SBB price series for HRS on the record of this investigation indicates that these are domestic prices in countries other than Turkey" and that this determination was consistent with its determination in *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China*, 77 Fed. Reg. 21744 (Apr. 11, 2012) (final CVD determ.) (in accompanying issues and decision memorandum at cmt. 5), in which it had excluded domestic prices from the input benchmark for wire rod because the petitioners had provided no evidence that the prices were representative of prices that would be available to purchasers in the PRC. *See id.* at 48.

Commerce here states that regardless of the quality of the data or the existence or nonexistence of trade barriers, domestic prices in countries other than Turkey are "not prices of [hot rolled steel] that would be available to purchasers in Turkey." Def's Resp. at 37, quoting *IDM* at 25

(Def's bracketing). Consistent with *Borusan*, the court remains unpersuaded by Maverick's arguments that Commerce's rejection of MEPS, CRU and SBB data was not supported by substantial evidence or not in accordance with law; Maverick is essentially asking the court to displace Commerce's "fairly conflicting views" on domestic price availability, which would be inappropriate. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("*Universal Camera*").

### B. Non-Inclusion of Certain Import Duties

In its preliminary determination, Commerce included import duties in the benchmark price based on the GTA export prices from certain countries. *See* PDoc 327 at 10 n.80; PDoc 328 at 9 n.71. For the *Final Determination*, Commerce concluded the record showed that imports of HRS into Turkey from certain countries are subject to a zero duty rate; therefore Commerce excluded import duties from the benchmark price for export prices from these countries. *IDM* at 46. The record evidence Commerce relied upon included: (1) the Turkish government's response that hot rolled steel coils were imported into Turkey under Harmonized Tariff Schedule ("HTS") number 7208; (2) Borusan's response that import duties do not apply to imports from European Union countries because they are subject to a zero duty rate; and (3) sections of the Turkish HTS for number 7208 showing a zero duty rate for imports of hot rolled steel into Turkey from European Union countries and certain other countries. *See* PDoc 179 at 4-5; PDoc 75 at 13; PDoc 73 at Ex. 10. Maverick argues the record evidence was inconsistent and incomplete, and therefore Commerce should not have excluded import duties from the export prices from those countries when it determined the benchmark for HRS. Maverick Br. at 10-12.

Commerce responds that Maverick is now arguing for the first time that the evidence on the record is unreliable, faulting Commerce for relying on a tariff schedule that is partially untranslated and claiming Commerce must have made a "typographical error" when it cited to pages four and five of the Turkish government's questionnaire response because "the portion of the Government of Turkey's questionnaire response that Commerce cited does not address hot-rolled steel import duties at all." Maverick Br. at 11. Commerce contends Maverick failed to exhaust administrative remedies on this issue both because Maverick could have placed rebuttal information on the record after obtaining Borusan's original questionnaire response and because it also had the opportunity to respond to the exact arguments on this point raised by both Toscelik and Borusan in its administrative rebuttal brief but did not do so.

The court tends to take a strict approach to the doctrine of administrative exhaustion in accordance with its statutory mandate. *See*, *e.g.*, *SeAH Steel Corp. v. United States*, 35 CIT ___, 764 F. Supp. 2d 1322, 1325 (2011), referencing *Jiaxing Brother Fastener Co., Ltd. v. United States*, 34 CIT 1455, 1465-67, 751 F. Supp. 2d 1345, 1355-57 (2010); *see also* 28 U.S.C. § 2637(d) (in trade cases the court "shall, where appropriate, require the exhaustion of administrative remedies"). There appears no reason to relax that requirement here. Pages 36 to 39 of Maverick's administrative rebuttal brief before Commerce are devoted almost entirely to arguing against adjusting the HRS benchmark to account for VAT and Borusan's "individual firm experience" in ocean and inland freight shipment. The inclusion of import duties, as consistent with Commerce's regulations and practice, is adverted to only perfunctorily on page 39 of that brief. By contrast, Maverick would here set forth in greater detail its reasoning on why the duties in this instance should not have been

excluded. The court is not persuaded that Maverick could not "seek administrative remedy" by fleshing out its argument of the issue in its rebuttal brief before Commerce rather than here, and therefore finds that the issue has not been administratively exhausted.[4]

II. *Toscelik's Motion for Judgment*

In the *Final Determination* Commerce determined a subsidy rate of 1.67 percent for Toscelik. Toscelik's 56.2 motion contests Commerce's determination that the Turkish HRS market is distorted by the presence of Eregli Demir ve Celik Fabrikalari T.A.S. ("Erdemir") and its subsidiary Iskenderun Iron & Steel Works Co. ("Isdemir") (collectively, "Erdemir"), its determination to reject as a tier-one benchmark Toscelik's HRS purchases from private foreign suppliers, its tier-two benchmark, its determination that Erdemir is a government authority, and the determination that the industries receiving the alleged HRS subsidy were "limited" in number.

Slip opinion 15-36 was issued after initial briefs were filed in this matter. Because the above claims are essentially the same as those addressed in that opinion, albeit as administratively determined with respect to Toscelik, Toscelik's reply brief states that they will defer

---

[4] Moreover, Maverick's substantive arguments on the issue again appear to move for substituting a fairly conflicting view of the evidence, which the court cannot do. *See Universal Camera,* 340 U.S. at 488. Commerce cited specifically to the Turkish government's declaration that HRS is imported under HTS 7208. *IDM* at 46, n.283. Commerce here explains that all of the key sections of the Turkish HTS are translated into English, Borusan identified which countries in English were covered by which sections, and the various sub-classifications under HTS 7208 are clearly discernible. Def's Resp. at 43, referencing PDoc 73 at Ex. 10. Maverick claims that because heading 7225 is also circled on the Turkish HTS on the record and because Borusan supplied only selected tariff line sections in its submission, the court must conclude that the evidence is inconsistent and incomplete, Maverick Br. at 12, but as Commerce argues there is no record evidence that calls into question the validity of the Turkish HTS supplied by Borusan and the validity of the Turkish government's response on this issue, and Maverick cites to none. *See* Def's Resp. 43-44.

to the court's prior decision on those issues.  This opinion, therefore and hereby, adopts and adheres to the reasoning of slip opinion 15-36 with respect to Toscelik's HRS-for-LTAR claims for purposes of remand, with one difference that was pressed more extensively in Toscelik's 56.2 brief than in Borusan's case:  As it considers on remand the issue of whether the Turkish HRS market was distorted during the POI, Commerce is hereby specifically requested to address more fully and directly the incongruity of Toscelik's evidence that it argues shows the prices it paid to Erdemir were higher than the prices it paid for imported coils and higher than its own cost of production, as summarized in Table 1 of Toscelik's confidential brief on its Rule 56.2 motion (referencing Toscelik's Questionnaire Response at Exhibit 22, CDoc 83), and explain how Erdemir's less-than-majority share of the HRS market gives it the power to dictate below-market import prices to major steel mills in Europe, Russia, and Ukraine.

With respect to the inclusion of import duties, VAT, and inland and ocean freight in the tier-two benchmark, slip opinion 15-36 concluded that Commerce's treatment of the import duties and VAT was lawful, in accordance with *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012), but remanded on the inland and ocean freight issues.  With respect to all such items, however, Toscelik makes the point that the benchmark of the *Final Determination* is a monthly price nearly twice that of Toscelik's own cost of production, of purchase prices from international suppliers, and of domestic U.S. *ex*-works prices, Toscelik Br. at 27 & 41, and that "[i]t is simply not reasonable or lawful for Commerce to construct a benchmark for a commodity product that is so inconsistent with commercial reality" as it does not comply with Commerce's legal obligation to calculate margins as accurately as possible in accordance with cases such as *Rhone Poulenc, Inc. v.*

*United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  *Id*. at 27.  *See* also Slip Op. 15-36 at 44.  The court agrees and hereby requests Commerce, in reconsidering this matter on remand consistent with *Borusan*, to demonstrate the reasonableness of any tier two benchmark redetermination in relation to an approximation of commercial reality.

Toscelik also challenges Commerce's valuation for benchmarking purposes of a land parcel that Toscelik was granted in 2008 for LTAR from the Osmaniye Organized Industrial Zone Authority, a state agency.  In the *Final Determination*, Commerce explained its approach to this valuation as follows

> We are relying on the land benchmark data used in *CWP Turkey 2011* AR [*i.e.*, administrative review] and *CWP Turkey 2010* AR.[5] Specifically, we used as our benchmark publicly available information concerning industrial land prices in Turkey for purposes of calculating a comparable commercial benchmark price for land available in Turkey.

*IDM* at 58.

The administrative valuation of this parcel was the subject of Toscelik's separate lawsuit in Court No. 13-00371.  Relying upon the principle and purpose of amortization itself, that litigation concluded that the average useful life ("AUL") schedule, once established, may not be altered in mid-stream, and upon remand Commerce, *inter alia*, restored the benchmark for the year 2008 parcel as originally calculated in *CWP Turkey 2010*.  *See Toscelik Profil ve Sac Endustrisi A.S.*

---

[5] *CWP Turkey 2011* and *CWP Turkey 2010* are the results of the 2011 and 2010 administrative reviews of the CVD order on steel pipe from Turkey, published respectively as *Circular Welded Carbon Steel Pipes and Tubes From Turkey*, 78 Fed. Reg. 64916 (Oct. 30, 2013) (final CVD admin. rev.) and accompanying issues and decision memorandum, and *Circular Welded Carbon Steel Pipes and Tubes from Turkey*, 77 Fed. Reg. 46713 (Aug. 6, 2012) (final CVD admin. rev.) and accompanying issues and decision memorandum.

*v. United States*, 38 CIT ___, Slip Op. 14-126 (Oct. 29, 2014), *remand results sustained*, 39 CIT ___, Slip Op. 15-28 (Apr. 1, 2015).  Toscelik would apply that same principle here.

Commerce argues that because the matter at bar involves a different program investigation (*inter alia*, HRS-for-LTAR in production of OCTG), the concerns expressed in Toscelik's earlier litigation are not inherent here, that there is no statutory or regulatory authority requiring that it use the same benchmark "forevermore, in all future proceedings in which that subsidy is analyzed", that it is reasonable to reconsider the valuation of the same parcel of land in different proceedings, and that the results of *CWP Turkey 2010* and *CWP Turkey 2011* are not binding on Commerce in the present proceeding.  Def's Resp. at 51.  However, as Toscelik points out in reply,

> [i]n the present *Final Determination*, Commerce explicitly relied on the 2010 and 2011 CWP reviews for its land valuation; Commerce did not recalculate anything, but brought into the present record the 2010 and 2011 final results (the 2011 remand results were not available at the time Commerce made the final determination herein).  Thus, Commerce explicitly pinned the present case to the records and determinations on the 2010 and 2011 CWP reviews.

Toscelik Reply at 3.  The difficulty of whether Commerce could recalculate the benchmarks *ab initio* in the present case is an issue that need not be reached, for Commerce has merely adopted the results of *CWP Turkey 2010 and 2011*, and thus when *CWP 2011* turned out to be unlawful and was corrected on remand, the *status quo* of the posture of that result applies directly to the present case.  For that reason, this issue must be remanded for correction.

*Conclusion*

Aspects of this matter must be remanded consistent with *Borusan* and the foregoing. The court will issue a separate remand order after further consultations with the parties. As to the substantive matters covered by this opinion:

**It is so ordered.**

/s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge

Dated: June 15, 2015
New York, New York